### UNITED STATES v. SOUTHERN RY. CO.

(District Court, S. D. Illinois.   March 2, 1905.)

#### No. 10,637.

1. RAILROADS—CARS USED IN INTERSTATE TRAFFIC—STATUTE REQUIRING AUTOMATIC COUPLERS.

   In an action against a railroad company engaged in interstate commerce to enforce the penalty for violation of section 2 of Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], which provides that "it shall be unlawful for any such interstate carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the cars," where it is shown that defendant hauled over its line and used in moving interstate traffic a car on which the safety coupler was broken, and which could not be uncoupled without the necessity of men going between the ends of the cars, it is not a defense that defendant exercised reasonable care and diligence to keep the coupling apparatus on its cars in repair.

**2. SAME—CARS USED IN INTERSTATE TRAFFIC.**

A car loaded with coal, to be delivered to a consignee in another state, is "used in moving interstate traffic," within the meaning of Act March 2, 1893, c. 196, § 2, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], by the railroad company which takes it from the place of loading, although such company only undertakes to deliver it to a connecting carrier within the same state.

**3. SAME—CARE IN INSPECTION.**

Where government inspectors found nine cars with defective coupling appliances among those cut out by defendant railroad company at one time for delivery to a connecting carrier, defendant cannot be held to have exercised reasonable care and diligence to discover and remedy the defects.

**4. SAME—CAR NOT TO BE USED IF COUPLING DEFECTIVE.**

What is forbidden by the act is the use of cars which cannot be coupled automatically by impact and uncoupled without the necessity of men going between the cars; and unless the car is so equipped it is not to be put in service, and not to be used.

**5. SAME—PLACING "M. C. B. DEFECT CARD" ON CAR DOES NOT RELIEVE DEFENDANT FROM RESPONSIBILITY.**

Placing an "M. C. B. defect card" upon a car, and noting on such car defects forbidden by the safety appliance act, which is notice to all connecting lines that the defendant sent the car out defective, and that other lines using the car would not have to account to defendant for the particular injury or defect noted on the card, is such a deliberate violation of the statute as to amount to a defiance of the law.

This action is brought under section 6 of the act in regard to safety appliances, approved March 2, 1893, c. 196, 27 Stat. 532, as amended April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3175], which provides a penalty of $100 for every violation of the act, and refers to the violation covered by section 2 of said act (27 Stat. 531 [U. S. Comp. St. 1901, p. 3174].

The material averments of the declaration are as follows: First, that the defendant is a common carrier engaged in interstate commerce by railroad; second, that on the 29th day of November, 1904, in the county of St. Clair, in the Southern District of Illinois, the defendant hauled and used on its line of railway coal car No. 1,353, and marked "L. E. & St. L. C. R.;" which car had on the "A" end thereof an inoperative uncoupling mechanism, so faulty that in handling said car it could not be uncoupled without the necessity of a person going between the end of said car and the one to which it might be coupled; third, that said car was then used in moving interstate traffic. The declaration also negatives the proviso contained in section 6 by averring that the car was not a four-wheel car, nor an eight-wheel standard logging car. In support of the first averment it was admitted on trial by counsel for the defendant that the defendant at the time stated in the declaration operated a line of railroad from East St. Louis, Ill., to Louisville, in the state of Kentucky. In further support of this averment the plaintiff introduced the waybill on which said car was hauled by the defendant, showing that it was billed by the defendant company from New Baden, Ill., to East St. Louis, Ill., consigned to the St. Louis Coal Company (the name of C. A. Ringhoff, Howard Station, "Bridge," and "Pacific," being written on the bill), and that at East St. Louis, Ill., the defendant company issued another waybill for the same car to the Missouri Pacific Railroad at St. Louis, Mo., and under the heading "Consignee and Final Destination" appeared, "C. A. Ringhoff, Howard Station, St. Louis, Missouri." It appeared that the car was loaded with coal from certain mines at New Baden, Ill., and that said coal was conveyed by the car to its destination at or near St. Louis, Mo. Said waybills were also offered to support the third averment in the declaration, namely, to show that the car at the time was engaged in moving interstate traffic. In support of the second averment, Messrs. Wright and Belnap, inspectors of the Interstate Commerce Commission, tes-

tified that they first inspected this car between 2 and 3 p. m. on November 29, 1904, on track No. 14 in the new yard or the Denver-side yard of the Southern Railway Company at East St. Louis, Ill., and found that the clevis, which is a part of the chain (also called "pin-chain") connecting the lever of the uncoupling mechanism with the lock pin, was missing from the "A" end of the car, rendering the uncoupling mechanism entirely inoperative on that end of the car. It further appeared from the testimony of said witnesses and the witnesses J. J. O'Briene and J. J. Devanney, that, with the uncoupling mechanism of said car in the condition in which it was found, it was impossible to uncouple the car at its "A" end from the car to which it might have been coupled without the necessity of a man going between the ends of the cars in order to lift the lock pin, or "lock block," as it is sometimes called. There was no testimony contradicting these statements. Said car was discovered in its defective condition at about the same time that eight other cars in the same drag were discovered to be in bad order as to their safety appliances. The yard of the defendant company in which the car was found is about two miles from the yard of the Terminal Railroad Association, near the Eads Bridge, to which it was delivered by the defendant company about 4:25 p. m. on November 29, 1904. The Terminal Railroad Association, to which the car was delivered, is a road engaged in transfer business by which passengers and freight are transferred to and fro between St. Louis, Mo., and East St. Louis, Ill., by way of the Eads Bridge, and the Terminal received this car upon the billing of the defendant company for the purpose of transferring it to its destination in Missouri. It further appeared from the evidence that, after the second or transfer billing was made out by the defendant company, the car was hauled by it under said billing from its Denver-side yards, a distance of about two miles, to the yards of the Terminal Railroad Association. The inspectors of the Interstate Commerce Commission went with said drag of cars, including the car involved in this case, from the Denver-side yards of the defendant company to the yards of the Terminal Railroad Association, and there called the attention of Mr. J. J. Devanney, foreman of the car department of the Terminal Railroad Association, to its defective condition. He noted the defect, and ordered the car repaired by the agents of the Terminal Railroad Association, and it was repaired by its employés C. E. Jones and John Waddell before the car crossed the river to St. Louis. At the time that Mr. Devanney ordered this car to be repaired, there was no mark upon it, made by the agents of the defendant company, showing that it was in bad order, and no directions were given by any agent of the defendant company for its repair. Morris Mehan, switchman for the defendant company at its Denver-side yards, testified that he frequently had to go between the ends of said cars to make uncouplings.

The defendant, as a defense, insisted, first, that the car in question was hauled by it from New Baden, Ill., to East St. Louis, Ill., and from there it was consigned to the Terminal Railroad Association for delivery across the Mississippi river from East St. Louis, Ill., to its destination in St. Louis, Mo., and that at the time when the defendant company hauled said car the car was not engaged in hauling interstate traffic, and that the defendant company did not transfer the car across the river. Secondly, it was insisted on behalf of defendant that the car in question had been originally so supplied with safety couplers as to comply with the federal statute, that in handling such a car the defendant could only be required to exercise reasonable diligence to see that it was kept in repair, that it had exercised such diligence in this case, and that it could not be held responsible for any defect which was not discovered by the exercise of such reasonable care. In support of this position it attempted to show by its chief car inspector and other inspectors that all cars were carefully inspected when they came into its yards, and that this car and others involved in these cases had been so inspected soon after they entered the yard; also that it again inspected cars made up in trains to go out to the eastward, but did not again inspect cars made up in drags to go to the Terminal. It was further insisted that an arrangement existed between the defendant company and the Terminal Railroad Association by which cars were delivered by the former to the latter, and, if found defective in any respect, they were to be repaired, and the ex-

pense charged to the defendant company. In this connection the defendant offered an "M. C. B. defect card," which says, among other things, "will be received at any point on this company's lines with the following defects." This card was to be tacked on the car on which the defect was found. It was admitted by Mr. Holloway, the chief inspector for the defendant, that this card was used by the defendant to cover defects under the safety appliance act, as well as other defects. Mr. O'Briene, foreman of the car department of the Terminal Railroad Association, testified that his company would not put this card on a car to cover defects under the safety appliance act, and that the card was used to show that connecting lines would not be charged with the defects noted thereon. Counsel for defendant further insisted that it was not practicable to again inspect these cars before sending them to the Terminal Railroad Association; that the original inspection given them when they arrived in the Southern Yards was sufficient, and a further inspection was unnecessary, as the Terminal Railroad Association was in duty bound to inspect these cars upon their receipt from the Southern Railway Company, and before sending them across the river. But the chief inspector for the defendant company further testified that it would have been practicable to further inspect them before sending them to the Terminal Railroad Association if a sufficient force of inspectors was provided. It further appeared that the defendant company is now inspecting the drags before sending to the Terminal. It further appeared from the evidence that at the time this car was discovered the defendant employed one day and one night inspector, and one day and one night light repairer, in the switchyards, and eight repairers on the repair tracks, while now it has three light repairers in the switchyards and twelve men working at the repair tracks; making an increase of 200 per cent. in light repairs since the filing of these suits, and 50 per cent. increase on their repair tracks. The inspection cards used by the yard inspector of the defendant were introduced in evidence, showing that the cars in question were not marked in bad order; but on cross-examination the inspector admitted that it was not his custom to note on the card such defects as appear in this case, but that he called the attention of the light-repair man to them, and directed him to make the repairs. Upon this showing it was insisted upon behalf of the plaintiff that these cards become entirely valueless as evidence, as they were not even supposed to show the defect in question. The evidence further showed that this particular car arrived in the Denverside yards on November 28, 1904, and was delivered to the Terminal on the afternoon of November 29, 1904. As a part of defendant's evidence there was offered circular No. 98, dated July 8, 1904, approved by S. R. Kennedy, superintendent, addressed "To all concerned," and stating that the defendant after July 10, 1904, would decline to receive from any connecting line any cars offered with defective safety appliances. In rebuttal plaintiff offered circular No. 53, issued June 11, 1904, by the Terminal Railroad Association, stating that after July 1, 1904, it would refuse to receive any cars having defective coupling appliances; also circular No. 118 of the Terminal, dated December 1, 1904, again calling attention to its circular No. 53, stating that "the only way to handle satisfactorily is for each line to make repairs to cars with defective safety appliances before offering to connections," and "refusing to receive from connections all cars with defective safety appliances." It appeared from the evidence that all the cars involved in cases against this defendant were found in one drag, and were all forwarded by the Terminal across the river upon billings furnished by this defendant, and were all destined for delivery to St. Louis, Mo.

The propositions of law which the defendant asked should be held by the court as applicable to the case are as follows:

"(1) It appears from the evidence in this case that the defendant had equipped the cars in question with couplers coupling automatically by impact, and which would be uncoupled without the necessity of a man going between the ends of the cars, and that they had been provided with grab irons and hand holds in the ends and sides of each car, for the greater security of men in coupling and uncoupling cars, as required by the act of Congress of March 2, 1893, amended April 1, 1896, and it is only contended by the government that the defendant is liable on account of not keeping these equipments in

repair. It is held as the law in such case that the defendant is only required to exercise reasonable care and diligence to keep such coupling apparatus and grab irons in repair.

"(2) The court holds that a railroad company engaged in interstate commerce, which has equipped its cars with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars, and has provided its cars with grab irons or hand holds in the ends and sides of each of its cars for greater security of men in coupling and uncoupling cars, as provided by the act of Congress of March 2, 1893, amended April 1, 1896—that such railroad company has not violated such act of Congress by hauling or permitting to be hauled or used on its line a car with such coupling apparatus or grab irons or hand holds out of repair, if it appears from the evidence that such railroad company has used reasonable care and diligence to keep such coupling apparatus and grab irons and hand holds in good repair."

Thos. Worthington, U. S. Atty., and H. A. Converse, Asst. U. S. Atty.

Edward C. Kramer, for defendant.

HUMPHREY, District Judge (after the above statement of facts). The defendant at the time in question was a common carrier engaged in interstate commerce. The coupling device was defective and inoperative, and the car at the time in question was being used in moving interstate traffic. The evidence is conclusive upon all these points. The courts have spoken so frequently and so plainly in defining interstate commerce, and the use of cars engaged in such commerce, that it should suffice to say that the evidence adduced as to the character of the defendant as an interstate carrier, and of the particular service in which the car 1,353 was being moved, meets all the conditions laid down by the courts as a test of interstate commerce, even to the latest expression of the Supreme Court of the United States, announced in Johnson v. Southern Pacific Company (December 19, 1904) 25 Sup. Ct. 158, 49 L. Ed. ——.

The evidence was overwhelming that the car was defective as to its safety appliances, and there was no contention on the part of the defendant that it was not in the defective condition claimed and proven by witnesses for the government. The defense rested on the contention that, if the car had been originally equipped with the coupling device required by law, it would not be liable under the statute for using a car whose safety appliances were defective, if it had exercised reasonable care and diligence to discover and repair the defect before placing the car in service. The defendant introduced evidence tending to show care and diligence in the employment of inspectors and repairers, and, at the close of the case, asked the court to hold propositions of law based upon this theory of defense.

The act of 1893 (Act March 2, 1893, c. 196, 27 Stat. 531), amended in 1896 (Act April 1, 1896, c. 87, 29 Stat. 85), provided:

"Sec. 2. That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." [U. S. Comp. St. 1901, p. 3174.]

"Sec. 6. That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any

car in violation of any of the provisions of this act, shall be liable to a penalty of one hundred dollars for each and every such violation." [U. S. Comp. St. 1901, p. 3175.]

What the act plainly forbade was the use of cars which could not be coupled automatically by impact, and uncoupled without the necessity of men going between the cars. Unless a car was so equipped, it was not to be put in service. It was not to be used. The act plainly prohibited its use, and fixed a penalty therefor.

While the act is penal and to be construed strictly, the construction given it by the courts must fairly carry out the legislative intent as described in the act. United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080; Johnson v. Southern Pacific, supra. What is the legislative intent here? It is clearly expressed in the first words of the preamble, "An act to promote the safety of employees," etc. Sections 1 and 2 of the act express the same purpose. The Supreme Court, in the Johnson Case, supra, in construing this act, has clearly indicated that it should be given such a construction as will accomplish the purpose for which it was intended. The construction contended for by defendant would practically nullify the act. The statute says that a common carrier shall not haul or use cars in a certain described condition. The defendant asks the court to hold, in effect, that they cannot haul the car in that condition, provided they have failed to use diligence to discover its defective condition, but that, if they have used due diligence, they may haul the car in its defective condition. In all such cases it would be impossible for the officers of the government to determine in advance whether a statute has been violated or not; but, before a prosecution could be properly instituted, they should go to the defendant company; ascertain what care it had used in regard to a certain car; determine as a matter of fact and law, whether the acts of the defendant constituted due diligence, and from that determine whether a prosecution might be safely instituted. It is evident that such a defense would take the very life out of the act in question, and render its enforcement impossible except in a few isolated cases. The courts cannot by judicial legislation read into the act any language which will excuse offenders, any more than they can read into it language which would increase their liability. Courts must enforce the law as they find it.

In State ex rel. Barton Co. v. Kansas City, Ft. S. & G. R. Co. (C. C.) 32 Fed. 722, Justice Brewer, in rendering his decision in a case against a railroad company for violating a statute regulating railroad crossings, says in part:

"Whatever criticism may be placed upon the use of the word 'conditions,' the intent of the Legislature is plain; and, although this is a penal statute, it is not to be so construed as to defeat the intent of the lawmaking power, giving full force to the intent of the Legislature. It is obvious that it meant to enact that a failure to comply with this mandatory provision cast upon the delinquent the prescribed penalty."

I have been unable to find that this character of defense has been sustained in any case which reached the courts of last resort. Counsel for defendant has not cited any authority in support of this doctrine of due diligence as a defense to a penal action. It is in the same cate-

gory with the question of intent under the revenue laws, and of good faith under statutes against handling adulterated goods, drugs, etc. It is certainly well established that the good intentions or the lack of evil intent on the part of a liquor dealer is no defense to a prosecution for the statutory penalty. If this is no defense in a quasi criminal action, it certainly would be none in a civil action involving the same facts. It has been held, under statutes called "police regulations for the public health," that the good faith, diligence, or good intentions of the vendor are no defense, if the facts are that he has sold goods in violation of the statute. Statutes providing that "whoever sells or keeps, or offers for sale, adulterated milk, or milk to which water or other foreign substances have been added," shall be punished, etc., have been held to throw the risk upon the seller of knowing that the article he offers for sale is not adulterated, and it is not necessary, in an indictment under such a statute, to allege or prove criminal intent or guilty knowledge. 1 Am. & Eng. Enc. of Law (2d Ed.) p. 744, note 1, and criminal cases cited. The same rule applies to cases forbidding the sale of oleomargarine or other imitations of dairy products unless express notice be given to the purchaser. State v. Newton, 50 N. J. Law, 549, 18 Atl. 77; Com. v. Gray, 150 Mass. 327, 23 N. E. 47. In Reg. v. Woodrow, 15 M. & W. 404, a dealer in and retailer of tobacco was held liable to the penalty imposed by statute for having in his possession adulterated tobacco, although he had purchased it as genuine, and had no knowledge or cause to suspect it was not so. One may be convicted of selling adulterated green tea under statute 35 & 36 Vict. 74, although he did not know that the tea was adulterated. L. R. 9 Q. B. 494. To convict one of violating the act making it a misdemeanor to sell adulterated wines, it is not necessary to prove that he knew the wines to be adulterated. Altschul v. State of Ohio, 8 Ohio Cir. Ct. R. 214, 4 O. C. D. 402. "The acts are properly construed as imposing the penalty when the act was done, no matter how innocently; and in such case the substance of the enactment is that a man shall take care that the statutory direction is obeyed, and that, if he fails to so do, he does it at his peril." Wills, J., in Reg. v. Tolson, 23 Q. B. Div. 168. "Many statutes which are in the nature of police regulations, as this is, impose criminal penalties, irrespective of any intent to violate them; the purpose being to require a degree of diligence for the protection of the public which shall render violation impossible." People v. Roby, 52 Mich. 577, 18 N. W. 365, 50 Am. Rep. 270 (the opinion in above is by Cooley, J.); People v. Snowberger (Mich.) 71 N. W. 497, 67 Am. St. Rep. 449.

The propositions of law submitted by defendant are therefore denied.

However, the case does not depend on the holding of the court on the propositions of law. The defendant did not exercise reasonable care and diligence to discover and repair the defects. The evidence shows that the inspection made by defendant's servants for the purpose of discovering and repairing defects in safety appliances before putting the car in use was so weak as to be almost farcical. The force of inspectors and repairers was wholly insufficient at the time, and has been largely increased since. The government inspectors had no difficulty in discovering the defects. They found eight other cars in a de-

fective condition in the same cut of cars. Such wholesale failure to discover defects implies method, and the evidence further supplies the reason. The defendant company, in the conduct of its business, contemplated and expected that in some instances it would put cars in use with defective safety appliances. The testimony of the chief inspector, Holloway, shows this. He testified that the company used what is called an "M. C. B. card." When this card was placed on a defective car, with the defect described on the card, it was notice to all connecting lines that the defendant sent the car out defective, and that other lines using the car would not have to account to defendant for the particular injury or defect noted on the car. He also testified that in some instances these cards were used for cars defective as to safety appliances. Here is such deliberate violation of the statute as to amount to defiance of the law.

The act is so highly meritorious, so generous in its purposes, so in harmony with the best sentiment of a humane people and a progressive government, that it appeals strongly to the courts for its prompt and vigorous enforcement.

The defendant is found guilty, and judgment will be entered for the statutory penalty.