## UNITED STATES v. SCOTT.

(District Court, W. D. Kentucky. October 23, 1906.)

COMMERCE—POWERS OF CONGRESS—STATUTE RELATING TO INTERSTATE CARRIERS AS EMPLOYERS.

Section 10 of Act June 1, 1898, 30 St. 428 [U. S. Comp. St. 1901, p. 3210], entitled "An act concerning carriers engaged in interstate commerce and their employés," which section makes it a criminal offense for any employer subject to the provisions of the act or any officer, agent, or receiver of such employer to require any employé to agree as a condition of his employment not to become or remain a member of any labor organization, or to threaten his removal, or otherwise discriminate against him because of such membership, or to attempt or conspire to prevent any employé who has been discharged or has quit from obtaining employment, is not in the constitutional sense a regulation of commerce or of commercial intercourse among the states, inasmuch as its essential object manifestly is only to regulate certain phases of the right of an employer to choose his own servants, whether the duties of those servants when employed shall relate to interstate commerce or not; and its provisions being thus broad and general, without limitation to transactions relating to interstate commerce, but applicable equally to matters beyond the control of Congress, it is unconstitutional and void.

On Demurrer to Indictment.

George Du Relle, U. S. Atty.

Morton K. Yonts, for railroad telegraph operators.

Jas. P. Helm & Ben. D. Warfield, for defendant.

EVANS, District Judge. Congress passed an act concerning carriers engaged in interstate commerce and their employés, which was approved June 1, 1898 (30 Stat. 424–428, c. 370 [U. S. Comp. St. 1901, pp. 3205–3211]). By its first section the act was made to apply to common carriers engaged in the transportation of passengers or property wholly by railroad or partly by railroad and partly by river for a continuous carriage or shipment from one state to another. Section 10 (30 Stat. 428 [U. S. Comp. St. 1901, p. 3210]) of the act is in this language:

"That any employer subject to the provisions of this act and any officer, agent, or receiver of such employer who shall require any employé, or any person seeking employment, as a condition of such employment, to enter into an agreement, either written or verbal, not to become or remain a member of any labor corporation, association, or organization; or shall threaten any employé with loss of employment, or shall unjustly discriminate against any employé because of his membership in such a labor corporation, association, or organization; or who shall require any employé or any person seeking employment, as a condition of such employment, to enter into a contract whereby such employé or applicant for employment shall agree to contribute to any fund for charitable, social, or beneficial purposes; to release such employer from legal liability for any personal injury by reason of any benefit received from such fund beyond the proportion of the benefit arising from the employer's contribution to such fund; or who shall, after having discharged an employé attempt or conspire to prevent such employé from obtaining employment, or who shall, after the quitting of an employé, attempt or conspire to prevent such employé from obtaining employment, is hereby declared to be guilty of a misdemeanor, and, upon conviction thereof in any court of the United States of competent jurisdiction in the district in which such offense was com-

mitted, shall be punished for each offense by a fine of not less than one hundred dollars and not more than one thousand dollars."

The indictment in this case contains six counts; but it will suffice to say that in substance each of them charges, in appropriate language, that the Louisville & Nashville Railroad Company is a common carrier engaged in the transportation by railroad of passengers and property by continuous carriage or shipment from one state into another; that the accused, J. M. Scott, is and was its agent and chief train dispatcher, and as such had supervision and control of the employment for the said company of certain telegraph operators, including those mentioned in the indictment, who were, as such, in the employment of the said railroad company; and that the accused did threaten them and each of them with the loss of their said employment if they joined a certain labor association known as the "Order of Railroad Telegraphers," which order was a corporation organized under the laws of the state of Iowa, but the aims and purposes of which are not otherwise shown.

The defendant has demurred to the indictment upon the ground that the provisions of section 10 of the act are not such as Congress is authorized by the Constitution of the United States to enact, and thus is raised a question of great delicacy as well as interest and importance, and one which therefore has called for very deliberate consideration. The subject has been carefully investigated by the court, and its conclusions are now to be stated.

It is conceded that there are no clauses of the federal Constitution which can support the tenth section of the act, unless it be those found in article 1, § 8, of that instrument. It is there provided that:

"The Congress shall have power [among other things] to regulate commerce with foreign nations, and among the several states, and with the Indian tribes [and] to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."

The interpretation of the last of these clauses is governed by the rule laid down by the Supreme Court in McCulloch v. Maryland, 4 Wheat. 421, 4 L. Ed. 579, which, ever since its announcement in 1819, has been accepted by that court (and, of course, by all other courts) as perfectly accurate. Speaking through Chief Justice Marshall, the court said:

"We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional."

In respect to the legislation now in question, emphasis may profitably be laid upon the elements of the rule requiring that legislation "shall be within the scope of the Constitution," that it shall "be plainly adapted" to constitutional ends, and be consistent with the spirit of that instrument.

Certain other elementary and well-understood propositions may also be noted at this point. First. Unless congressional legislation be supported by constitutional authority, it cannot be supported at all. The rule in this respect is different from the rule applicable to state legislation, which is usually valid unless expressly forbidden. In other words, congressional legislation must have warrant in the language of the Constitution, while state legislation may be valid unless expressly prohibited. Second. Every congressional enactment is presumed to be a constitutional exercise of power until the contrary is clearly established, and proper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to this presumption, unless the lack of constitutional authority to pass an act in question is clearly demonstrated. United States v. Harris, 106 U. S. 635, 1 Sup. Ct. 601, 27 L. Ed. 290; Trade-Mark Cases, 100 U. S. 96, 25 L. Ed. 550. Third. But, if the unconstitutionality of an act is demonstrated, the courts of the United States, whether the highest or the lowest of them, and especially the former, have not hesitated so to decide. The well-established rule for our guidance in such cases is stated by Chief Justice Fuller in Pollock v. Farmers' Loan & Trust Co., 157 U. S., at page 554, 15 Sup. Ct., at page 679 (39 L. Ed. 759), as follows:

"Necessarily the power to declare a law unconstitutional is always exercised with reluctance, but the duty to do so, in a proper case, cannot be declined, and must be discharged in accordance with the deliberate judgment of the tribunal in which the validity of the enactment is directly drawn in question."

A number of congressional enactments have been held to be void, but we will note only a few of them, such as Hepburn v. Griswold, 8 Wall. 610, 19 L. Ed. 513, which nullified the legal tender legislation, the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, which overthrew the legislation respecting trade-marks, the Civil Rights Cases, 109 U. S. 3, 3 Sup. Ct. 18, 27 L. Ed. 835, which declared the legislation of Congress designed to protect civil rights under the fourteenth amendment to be invalid, the case of Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759, which disposed, in the same way, of the legislation imposing an income tax, and the case of James v. Bowman, 190 U. S. 127, 23 Sup. Ct. 678, 47 L. Ed. 979, which held that the legislation designed to protect the right of suffrage under the fifteenth amendment, which expressly gave Congress the power to enforce the amendment by appropriate legislation, was unconstitutional. We can hardly fail to observe that the legislation in each of the cases just named was of much greater moment than that embraced in section 10 of the act of June 1, 1898, although that fact of itself might not be particularly important in its effect upon judicial action.

While the tide of advancing events has wisely and inevitably forced upon the courts the necessity of giving broad and apparently ever-expanding latitude to the commerce clause of the Constitution, still it may be that there should be a limit to its elasticity, and possibly it might not be an altogether unmixed evil for some of the people now, as was once the habit, to call for a strict construction of that instru-

ment. If such call served no other purpose, it might be useful·as the occasional hoisting of a cautionary signal. Our government was organized and has greatly prospered under a system of "checks and balances," and it should always be remembered that those checks and balances yet remain for most essential purposes. Certainly the writer will always cherish the highest respect for the Congress of the United States, and in a·particular sense for that. Congress which enacted the legislation now before the court, but that respect should not prevent a careful and attentive investigation of the questions involved in this case when they are raised by a citizen in his own defense against a serious criminal charge.

The word "commerce" as used in the Constitution, has been defined by the Supreme ·Court. In the great case of Gibbons v. Ogden, 9 Wheat. 189, 6 L. Ed. 23, it was said:

"Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribed rules for carrying on that intercourse."

The power conferred upon Congress is to regulate this commercial intercourse and the carrying on thereof among the states, and unquestionably it may devise any proper and necessary means for doing that particular thing. Does the legislation now in question, in any fair sense, regulate commercial intercourse among the states, or does it only regulate certain phases of the intercourse between employer and employé? If the latter is all, even though this legislation is associated in the same act with other provisions which do regulate commercial intercourse among the states, can it be maintained as constitutional? It is elementary that one provision in an act may be constitutional and another unconstitutional. One may stand and the other fall if they may be separated, as here they easily can be as between section 10 and the other clauses of the act; so that section 10 might fall and the remaining portions of the act of June 1, 1898, be constitutional. It is true it has been judicially determined that Congress has the power, in regulating interstate commerce, to impose duties upon carriers which have reference to the safety of employés while actually discharging duties pertaining to interstate commerce, as well as to that of passengers and property; but it can hardly be fairly contended that the provisions of section 10 have any such purpose in view.

Those provisions relate, not to the safety of the employés while actually discharging duties pertaining to interstate commerce, but to their being members of labor unions, and, in the matter of making and enforcing contracts for hiring them, forbids discriminations against them on that ground. Indeed, we cannot, and we certainly should not, shut our eyes to the fact (which is clear enough upon the face of the section as well as otherwise) that the essential purpose of the enactment was not to "regulate commercial intercourse among the states," but was to prevent, generally, discriminations against what is called union labor in one state alone as well as in more than one. We cannot too strongly emphasize this obvious fact. If this proposition be true (and it seems to us that no one can fairly doubt it),

then the question is settled; for, whatever the states might do in such matters through their own Legislatures, the Constitution of the United States does not confer upon Congress by any express language, nor by any fair implication from any language used, the power, when servants are employed, to prevent discriminations against union labor, either in Kentucky alone or in several states, even if the hirer at the time does happen to be engaged in interstate traffic. Such legislation for such a purpose cannot be supposed to have been in the contemplation of the framers of the Constitution. The legislation to prevent discrimination against union labor in respect to employing or retaining servants, therefore, is not, in the opinion of the court, a regulation of commerce, and certainly it is not a "regulation of commercial intercourse among the states" within the meaning of the Constitution, and yet the regulation of that one thing, namely, the matter of discrimination against members of labor unions in respect to the employment and retention of servants, is the clear and only purpose of section 10. Looking squarely at the language of the section, this would seem to be the only conclusion that is possible.

Viewing the matter from another and somewhat narrower standpoint, we find another most cogent objection to section 10 of the act. In the Trade-Mark Cases, 100 U. S., at page 96, 25 L. Ed. 550, Justice Miller, speaking for the court, said:

"Governed by this view of our duty, we proceed to remark that a glance at the commerce clause of the Constitution discloses at once what has been often the subject of comment in this court and out of it, that the power of regulation there conferred on Congress is limited to commerce with foreign nations, commerce among the states, and commerce with the Indian tribes. While bearing in mind the liberal construction that commerce with foreign nations means commerce between citizens of the United States and citizens and subjects of foreign nations, and commerce among the states means commerce between the individual citizens of different states, there still remains a very large amount of commerce, perhaps the largest, which, being trade or traffic between citizens of the same state, is beyond the control of Congress. When, therefore, Congress undertakes to enact a law which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several states, or with the Indian tribes. If not so limited, it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, to commerce at all points, especially if it be apparent that it is designed to govern the commerce wholly between citizens of the same state, it is obviously the exercise of a power not confided to Congress. We find no recognition of this principle in the chapter on trade-marks in the Revised Statutes."

See, also, Baldwin v. Franks, 120 U. S. 686, 7 Sup. Ct. 656, 763, 32 L. Ed. 766.

Now, it cannot be overlooked that the legislation, the constitutionality of which is drawn in question by the demurrer to the indictment in this case, undertakes to punish any discrimination against union labor by any railroad company which is actually engaged in interstate commerce, whether such discrimination be in respect to the hiring or retention of telegraph operators employed in respect to purely local and state traffic, or to the hiring or retention of those employed in respect to commerce among the states. Properly construed, the indictment fails to show whether the operators named therein were em-

ployed upon one or the other description of commerce, but whether this is so or not, the characteristic we have imputed to section 10 would seem manifestly to bring the objections to it within the reach of those sustained by the Supreme Court in its condemnation of the trade-mark legislation.

Again, it may well be said that section 10 regulates in a certain respect the outside conduct of those railroad companies which, as part of their business, engage in interstate commerce, but it does not regulate the commerce itself, and what it does regulate has as much and probably more relation to state commerce than to that which is interstate. Section 10 of the act, in short, does not differentiate cases where the telegraph operator is employed in merely local and state traffic from cases where the work relates to interstate traffic. Both those who work upon local and state traffic and those who work upon interstate commerce are embraced by the legislation indiscriminately. In other words, all are equally embraced in the provisions of section 10, whether the operator works upon local or state business only or upon interstate traffic. In the opinion of the court it cannot reasonably be doubted that this brings section 10 within the rule laid down in the Trade-Mark Cases.

While section 10, as a whole, is easily separable from other provisions of the act of June 1, 1898, its own clauses are not separable from each other, and other observations of the Supreme Court in its opinion in the Trade-Mark Cases, 100 U. S., pp. 98, 99, 25 L. Ed. 550, may very appropriately be referred to in this connection. It was there said:

"It was urged, however, that the general description of the offense included the more limited one, and that the section was valid where such was in fact the cause of denial. But the court said, through the Chief Justice: 'We are not able to reject a part which is unconstitutional and retain the remainder, because it is not possible to separate that which is constitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not there now. Each of the sections must stand as a whole, or fall altogether. The language is plain. There is no room for construction, unless it be as to the effect of the Constitution. The question, then, to be determined is, whether we can introduce words of limitation into a penal statute so as to make it specific, when, as expressed, it is general only. * * * To limit this statute in the manner now asked for would be to make a new law, not to enforce an old one. This is no part of our duty.' If we should, in the case before us, undertake to make by judicial construction a law which Congress did not make, it is quite probable that we should do what, if the matter were now before that body, it would be unwilling to do, namely, make a trade-mark law which is only partial in its operation, and which would complicate the rights which parties would hold, in some instances, under the act of Congress, and in others under state law."

The same view was also taken in Baldwin v. Franks, 120 U. S. 687, 7 Sup. Ct. 656, 763, 32 L. Ed. 766.

The able arguments of counsel have included a discussion of many collateral questions supposed to have more or less bearing upon the main points involved, such as the question of class legislation and the objection thereto, the question of the right of private contract, and the danger of interfering therewith, and the question of the alleged public,

and overwhelming necessity that the carriers of the country shall be left in full control of the matter of the employment of their own servants and in the exclusive exercise of the right to select them and discipline them. Certainly it might be pertinently contended that that was class legislation, and possibly very unfair legislation, which, favoring a certain class, made it criminal to discriminate against it, and yet permitted that very class of labor to discriminate arbitrarily against everybody else. Justice might rather demand (if, indeed, the questions of fitness and freedom of choice are to be ignored or minimized) that any discrimination by any class against any other class of laborers should be forbidden, if any is, inasmuch as one class of laborers is probably no more sacred than another, and the weaker class is quite as much entitled to protection against the powerful as the latter is against the former. To forbid discriminations against union labor, while discriminations by it against others, if made, are allowed, would not seem to be a very palpable or conspicuous example of equal and exact justice to all, and might be open to the criticism that it is class legislation. But, while all these considerations might have weight in other connections, still the court prefers to put its judgment in this case upon two propositions, viz.: (1) That section 10 of the act of June 1, 1898, is not, in the constitutional sense, a regulation of commerce or of commercial intercourse among the states, and cannot justly nor fairly be so construed or treated, inasmuch as its essential object manifestly is only to regulate certain phases of the right of an employer to choose his own servants, whether the duties of those servants when employed shall relate to interstate commerce or not; and (2) upon the ground that section 10 is so broad as to be condemned by the rule laid down in the Trade-Mark Cases.

These considerations have brought the court to the very clear and deliberate conclusion that section 10 of the act of June 1, 1898, is not sustained by constitutional warrant, and is therefore insufficient to support the indictment.

The demurrer must be sustained.