## UNITED STATES v. ATLANTIC COAST LINE R. CO.

(District Court, E. D. North Carolina. May 21, 1907.)

1. RAILROADS—EQUIPMENT OF CARS—SAFETY APPLIANCES—VIOLATION OF STATUTE—PENALTY—ENFORCEMENT—PLEADING.

An action by the United States against a railroad company to recover penalties for violations of the safety appliance act of March 2, 1893 (27 Stat. 531, c. 196 [U. S. Comp. St. 1901, p. 3174]), is one of debt, and in such an action brought in North Carolina, where the pleading is governed by the state practice, it is not necessary that the complaint should allege a specific date in describing the violations.

[Ed. Note.—Conformity of practice in common-law actions to that of state court, see notes to O'Connell v. Reed, 5 C. C. A. 594, and Nederland Life Ins. Co. v. Hall, 27 C. C. A. 392.]

2. SAME—BURDEN OF PROOF.

In an action to recover penalties from a railroad company brought under section 6 of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 53 [U. S. Comp. St. 1901, p. 3174]), as amended by Act April 1, 1896, c. 87, 29 Stat. 85, the burden rests upon the defendant to bring itself within the proviso, excepting from the provision of the act four-wheeled standard logging cars.

[Ed. Note.—Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

3. SAME—PLEADING.

In such an action, it is not incumbent on the plaintiff to allege and prove that the defendant had not used due care or ordinary diligence in making an inspection or in repairing such defects as that inspection may have disclosed; the purpose of the statute being to make a railroad company liable unconditionally for its violation.

4. COMMERCE — RAILROAD REGULATION — SAFETY APPLIANCE ACT — CONSTITUTIONALITY.

The federal safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), as amended by Act April 1, 1896, c. 87, 29 Stat. 85, and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1905, p. 603], is within the constitutional power of Congress to regulate interstate commerce.

On Demurrer to Complaint.

Harry Skinner, U. S. Atty., and Luther M. Walter, Asst. U. S. Atty.

Junius Davis and Geo. B. Elliott, for defendant.

PURNELL, District Judge. A bill was filed asking for penalties, 45 in number of $100 under each for violations of the act of March 2, 1893, known as the "Safety Appliance Act" (Act March 2, 1893, c. 196, § 1, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), as amended by Act April 1, 1896, 29 Stat. 85 and Act March 2, 1903, c. 976, § 1, 32 Stat. 943 [U. S. Comp. St. Supp. 603]. The bill of complaint alleges that defendant is a common carrier engaged in interstate commerce, and is a corporation organized and doing business under the laws of the states of Virginia, North Carolina, and other states, having an office and place of business at South Rocky Mount in the state of North Carolina. Of the offenses made the basis of this suit, 41 were violations of section 2 of the act (defective couplings) and 4 were violations of section 4 (failure to have secure grab irons and handholds). The defendant has filed a demurrer to each count and sets up 9 specific grounds of demurrer. Only 3 general grounds were urged in support of the demurrer at the hearing:

First. That the complaint is defective, in that it alleges the violation "on or about" a particular date, and one other adverted to, to wit, that the act of Congress is unconstitutional, but this position was not vigorously insisted on. A pleading in a civil suit need not be as precise in naming dates as when the prosecution is by indictment. It is provided by federal statute that, as to matters of practice and pleading, the courts of the United States shall conform as near as may be to the practice and pleadings and forms and mode of proceeding to the state courts. Rev. St. 914 [U. S. Comp. St. 1901, p. 684]. It follows, therefore, that whether the petition is defective in the regard complained of depends upon the practice in the courts of North Carolina. Section 6 of the safety appliance act provides that the penalty for a violation of the act shall be $100, "to be recovered in a suit or suits to be brought by the United States district attorney in the District Court of the United States having jurisdiction in the locality where such violations shall have been committed." This is an action in debt. United States v. Southern Railway Company, 135 Fed. 122. The rule in North Carolina is that in cases of this nature the naming of a specific date is not necessary in stating the cause of action in the complaint. In Lumber Co. v. Railroad, 141 N. C. 171, 53 S. E. 823, it was held that in a suit to recover penalties against a defendant on account of discriminating in overcharges on shipments of logs it was sufficient to locate the time of shipments between the 15th day of November, 1898, and the 30th day of April, 1901, inasmuch as the defendant could ask for a bill of particulars. The defendant is clearly put upon its defense. The number of the car and nature of the traffic and the date given in each count sufficiently advise the defendant of the time of the violation, so that it can intelligently prepare its defense. This is sufficient.

Second. Complaint does not negative proviso in section 6. Another ground urged in support of the demurrer is that the complaint does not allege that the cars mentioned in the various causes of action were not four-wheel cars or eight-wheel standard logging cars. The Supreme Court of the United States in the case of Schlemmer v. B. R. & P. Ry. Co. (October term, 1906, decided March 4, 1907) 27 Sup. Ct. 407, 51 L. Ed. ——, says on that point, Justice Holmes delivering the opinion:

"A faint suggestion was made that the proviso in section 6 of the act that nothing in it shall apply to trains composed of four-wheeled cars was not negatived by the plaintiff. The fair inference from the evidence is that this was an unusually large car of the ordinary pattern; but, further, if the defendant wished to rely upon this proviso, the burden was upon it to bring itself within the exception. The word 'provided' is used in our legislation for many other purposes besides that of expressing a condition. The only difference expressed by this clause is that four-wheeled cars shall be excepted from the requirements of the act. In substance, it merely creates an exception which has been said to be the general purpose of such clauses. Baird Case, 194 U. S. 25, 36, 37, 24 Sup. Ct. 563, 48 L. Ed. 860, 865, 866. 'The general rule of law is that a proviso carves special exceptions only out of the body of the act; and those who set up any such exception must establish it.' The rule applied to construction is applied equally to the burden of proof in a case like this."

Another ground urged in support of the demurrer is that the complaint does not allege that the defect was discovered, or could by reasonable inspection have been discovered, so that the car could have been repaired before it was hauled or moved, as alleged in the complaint. This precise question—that is, whether, in order to establish a violation of the safety appliance act, it is necessary or incumbent upon the plaintiff to show that the defendant had not used due care or ordinary diligence in making an inspection and in repairing such defects as that inspection may have shown to exist—is one of the most important which has yet arisen in the enforcement of the safety appliance act. If the contention of the defendant in this respect be correct, then a restriction has been placed upon the provisions of the act, which will seriously hamper the government in its efforts to enforce the provisions of the statute. The title of the act of March 2, 1893, is:

"An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving wheel brakes, and for other purposes."

By section 1 of the act it is made unlawful for a carrier engaged in interstate commerce by railroad to use a locomotive engine not equipped with power driving-wheel brakes and appliances for operating the train brake system. By section 2 it is made unlawful to use a car not equipped with automatic couplers. By section 4 it is made unlawful to use a car not provided with secure grab irons or handholds. By section 5 it is made unlawful to use a car whose drawbars do not conform to the standard height. By section 6 it is provided that the United States shall have a right of action to recover a penalty from the common carrier using, hauling, or permitting to be hauled or used on its line "any car in violation of any of the provisions of this act."

By section 8 it is provided that, whenever an employé is injured by "any locomotive, car, or train in use contrary to the provision of this act," he shall not be deemed to have assumed the risk occasioned by such use of the locomotive, car or train. In other words, whenever a carrier uses a car in violation of the provisions of the act, the United States shall have a right to the penalty of $100, and the injured employé shall be protected from the defense of "assumption of risk." There are therefore two penalties fixed upon the carrier. One is the $100 payable to the United States, and the other is the denial of assumption of risk as a defense when sued by an injured employé. The primary test as to whether the two penalties should be applied is the same in each instance, viz., Was the car used in violation of the provisions of the act? The United States can recover the penalty of $100 under all circumstances where the injured employé has the benefit of the denial of the doctrine of "assumption of risk" as a matter of defense by the carrier.

One of the first cases arising under the safety appliance act was that of an injured employé, decided by the Circuit Court of Appeals for the Eighth Circuit, wherein certain conclusions as to the provisions of the act were announced by that court. Johnson v. Southern Pacific Railway, 117 Fed. 462, 54 C. C. A. 508. The facts in that case were as follows: The defendant, Southern Pacific Railway Company, was an interstate common carrier by railroad, operating trains between San Francisco, Cal., and Ogden, Utah. In the course of its operations it had occasion to run as a part of the equipment of a certain passenger train a dining car which, at a certain station in the state of Utah, was left on a side track to be picked up and returned to its initial terminal by a west-bound train of the same company. For the convenient execution of the return movement, Johnson, a brakeman in the employ of the defendant company, undertook, under orders, to couple one of the defendant's engines to said dining car for the purpose of taking it to a neighboring turntable, to be there turned around and placed in position to resume its return journey. The engine was equipped with power driving-wheel brakes and also with a Janney coupler, and the dining car was equipped with a Miller coupler. Each of these couplers was a so-called "automatic" or "safety" coupler, which would couple by impact with couplers of its own type, but the two would not couple by impact with each other because of differences in construction or type. Johnson knew that the couplers would not couple automatically, and he undertook to make the coupling by using a link and pin. To make the coupling in such manner it was necessary for him to go between the ends of the engine and the dining car, and he did so. Two attempts to make the coupling failed, and in the course of the third attempt his hand was crushed so that it became necessary to amputate his arm above the wrist. He sued the company, his employer, for damages, alleging negligence on the part of the latter in that on the occasion in question it was using on its line "cars" not equipped as required by said statute, and that he, as an employé of said company, was relieved by the provisions of the eighth section of said statute from the doctrine concerning "assumed risks," while endeavoring, under orders, to make the coupling in question. The

trial court directed the jury to return a verdict for the defendant. The Circuit Court of Appeals, affirming the judgment of the trial court, held that under the common law the plaintiff assumed the risks and dangers of the coupling which he endeavored to make, and that the provisions of the statute in question did not have the effect of relieving him from this burden, as was contended.

It also decided, in the same connection, that the statute did not forbid the use of locomotives not equipped with automatic couplers; that both the engine and the car in question were equipped as the law directs, the one driving-wheel brakes and the other with automatic couplers; that the statute changes the common law. and must be strictly construed, and that the general law is not to be abrogated by such a statute further than the clear import of its language requires; that it was also a penal statute, and its provisions should not be so broadened by judicial construction as to compel the punishment of an act not. denounced by the fair import of its terms; that even, if the word "car" means or includes "locomotives," still the case does not fall within the prohibitions of the law because both the locomotive and the car were, in fact, equipped with automatic couplers. The statute contains no words requiring all cars used on an interstate road or used in interstate commerce on any particular road to be equipped with the same kind of coupling or with couplers which will couple automatically by impact with every other coupler with which it may be brought into contact in the usual course of business. A car "equipped with practical and efficient automatic couplers  *  · *  *  which will couple automatically with those of their [own] kind fully and literally complies with the terms of the law, although these [such] couplers will not couple automatically with automatic couplers of all [other] kinds or constructions. The dining car and the locomotive were both so equipped. Each was provided with an automatic coupler which would couple with those of its kind, as provided by the statute, although they would not couple with each other. Each was accordingly equipped as the statute directs, and the defendant was guilty of no violation of it by their use." Page 470 of 117 Fed., page 508 of 54 C. C. A. To review the judgment of the Circuit Court of Appeals affirming the judgment of the trial court in favor of the defendant company, at the instance of Johnson, the case was brought into the Supreme Court of the United States both on certiorari and by writ of error. While the case was pending in the Supreme Court, and before it had been argued there, Congress enacted and the President approved the act of March 2, 1903 (32 Stat. 943, c. 976), entitled "An act to amend an act  *  *  * approved March 2, 1893," etc., by the first section of which it was declared "that the provisions and requirements of the act of  *  *  .* March 2, 1893, shall be held to apply  *  *  * in all cases, whether or not the couplers brought together are of the same kind, make, or type; and the provisions and requirements hereof and of said acts relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce,  ·*  *  *  and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith," with certain expressed

exceptions not important here. It must be noted that the act applies "in all cases" of coupling or attempted coupling. In this state of the law the Johnson Case came on for hearing before the Supreme Court and was argued by counsel on October 31, 1904. On the 19th day of December, 1904, the unanimous court, speaking through its Chief Justice, reversed the judgments both of the Circuit Court of Appeals and of the Circuit Court, and remanded the cause, with instructions to set aside the verdict and award a new trial. 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. In the course of its opinion the Supreme Court, after setting forth in extenso the provisions of sections 2 and 8 of the act of March 2, 1903, above referred to, and after reciting that the Circuit Court of Appeals had held, "in substance, * * * that the locomotive and car were both equipped as required by the act, as the one had a power driving-wheel brake and the other a coupler, that section 2 did not apply to locomotives, * * * and that the locomotive, as well as the dining car, was furnished with an automatic coupler, so that each was equipped as the statute required, if section 2 applied to both," proceeds as follows:

"We are unable to accept these conclusions, notwithstanding the able opinion of the majority, as they appear to us to be inconsistent with the plain intention of Congress, to defeat the object of the legislation, and to be arrived at by an inadmissible narrowness of construction. The intention of Congress, declared in the preamble and in sections 1 and 2 of the act, was 'to promote the safety of employees and travellers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes, and their locomotives with driving-wheel brakes,' those brakes to be accompanied with 'appliances for operating the train brake system,' and every car to be 'equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars,' whereby the danger and risk consequent on the existing system was averted as far as possible. The present case is that of an injured employé, and involves the application of the act in respect of automatic couplers; the preliminary question being whether locomotives are required to be equipped with such couplers. And it is not to be successfully denied that they are so required if the words 'any car' of the second section were intended to embrace and do embrace locomotives. * * * Now, it was as necessary for the safety of employés in coupling and uncoupling that locomotives should be equipped with automatic couplers as it was that freight and passenger and dining cars should be. * * * And manifestly the word 'car' was used in its generic sense. * * * Tested by context, subject-matter, and objects, 'any car' meant all kinds of cars running on the rails, including locomotives. * * * The result is that, if the locomotive in question was not equipped with automatic couplers, the company failed to comply with the provisions of the act. It appears, however, that this locomotive was in fact equipped with automatic couplers, as well as the dining car, but that the couplers on each, which were of different types, would not couple with each other automatically by impact, so as to render it unnecessary for men to go between the cars to couple and uncouple. Nevertheless the Circuit Court of Appeals was of opinion that it would be an unwarrantable extension of the terms of the law to hold that, where the couplers would couple automatically with couplers of their own kind, the couplers must so couple with couplers of different kinds. But we think that what the act plainly forbade was the use of cars which could not be coupled together automatically by impact by means of the couplers actually used on the cars to be coupled. The object was to protect the lives and limbs of railroad employés by rendering it unnecessary for a man operating the couplers to go between the ends of the cars, and that object would be defeated, not necessarily by the use of automatic couplers of different kinds, but if those different kinds would not automatically couple with each other. The point was that the railroad companies

should be compelled, respectively, to adopt devices, whatever they were, which would act so far uniformly as to eliminate the danger consequent on men going between the cars. If the language used were open to construction, we are constrained to say that the construction put upon the act by the Circuit Court of Appeals was altogether too narrow. * * * The primary object of the act was to promote the public welfare by securing the safety of employés and travelers, and it was in that aspect remedial, while for violations a penalty of $100 recoverable in a civil action, was provided for, and in that aspect it was penal. But the design to give relief was more dominant than to inflict punishment. * * * Moreover, it is settled that, 'though penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction of penal as well as other statutes; and they are not to be construed so strictly as to defeat the obvious intention of the Legislature.' * * * Tested by these principles, we think the view of the Circuit Court of Appeals, which limits the second section to merely providing automatic couplers, does not give due effect to the words 'coupled automatically by impact, and which can be uncoupled without the necessity of men going between the cars,' and cannot be sustained. * * * The risk in coupling and uncoupling was the evil sought to be remedied, and that risk was to be obviated by the use of couplers actually coupling automatically. True, no particular design was required, but whatever the devices used they were to be effectively interchangeable. * * * That this was the scope of the statute is confirmed by the circumstances surrounding its enactment as exhibited in public documents to which we are at liberty to refer. * * * In the present case the couplings would not work together, Johnson was obliged to go between the cars, and the law was not complied with. * * *"

Referring to the act of March 2, 1903, amending the prior act of 1893, the court said:

"As we have no doubt of the meaning of the prior law, the subsequent legislation cannot be regarded as intended to operate to destroy it. Indeed, the latter act is affirmative and declaratory, and, in effect, only construed and applied the former act. * * * This legislative recognition of the scope of the prior law fortifies, and does not weaken the conclusion at which we have arrived."

The rules laid down in that case by Chief Justice Fuller are controlling in the disposition of the points raised by the defendant in this case. Such a construction must be given the statute as will accomplish the evident intent of Congress. The statute must not be frittered away by judicial construction. The court cannot read into the statute what Congress has omitted.

Other authorities unnecessary to cite appear in the reports. The case cited above is the last of the highest court of the land. It is in accord or confirmatory of many decisions in the District Courts cited in the brief, and is controlling.

The argument of the claim that the act of Congress is unconstitutional was not, as the court understood counsel, seriously insisted on. Only the opinions in U. S. v. Scott (D. C.) 148 Fed. 431, and Brooks v. Southern Pacific Co. (C. C.) 148 Fed. 986, were cited for the position when the court reminded or asked counsel if the contrary had not been decided. It is best for the court to consider and pass upon the question raised. I cannot concur in the views or argument that the act is in excess of power granted to Congress, and for that reason void. These opinions were on the first as to provision making it a criminal offense for any employer to require any employé to agree not to become or remain a member of a labor organization, etc.

As it is understood this question is now before the Supreme Court on appeal, it would seem unnecessary to discuss it further than to hold the act of Congress and the amendatory acts are not in violation of the Constitution as contended by defendants in this cause. Spain v. St. L. & S. F. R. Co. (C. C.) 151 Fed. 522.

The demurrer is overruled and a decree will be entered accordingly, with the usual leave to answer.